SUMMARY
DUPRIS, C.J. for the Panel.
In this case we are asked to examine our government in the context of our customs and traditions and the relevance of our customs and traditions in the context of our current laws. It is a case in which some tribal members are dissatisfied with the way their elected leaders are handling issues important to our Tribes, and in which one of these tribal members has brought the matter to our Courts for a resolution.
Some of the legal issues have been addressed by this Court in the past; some of the legal issues already have legal foundations established in our cases, yet their complexities and nuances need clarification under the circumstances of this case. We hope we will be able to provide that clarification in this opinion.
The undisputed relevant facts are as follows:
In 2012 the Confederated Tribes of the Colville Reservation (CCT or Tribes) settled a lawsuit against the United States for mismanagement of trust assets. In the settlement the Tribes received $193 million (hereafter moneys). Initially the Colville Business Council (CBC), in its constitutional capacity as representatives of the Tribes, distributed 20% of the moneys to the tribal membership; at a later date, pursuant to Resolution 2012-539, the CBC authorized distribution of another 30% of the moneys to the tribal membership, from which the CBC authorized certain holds or deductions from the payment to be made for debts owed to the Tribes by some of the members. This latter amount was voted on for distribution by the CBC pursuant to a specific request made by some tribal members. These members had submitted a Petition to the CBC requesting the distribution.
After the distribution of 50% of the moneys, some tribal members, including the appellant in this case, allegedly signed a petition asking the CBC to hold a referendum vote of the membership regarding whether the remaining 50% of the moneys should be distributed to the membership. According to the original: Civil Complaint filed in this case on May 23, 2013, one of the alleged signers of the petition for distribution of the remaining 50% attempted to present the petition to one of the Council members at the Council chambers. Appellant alleges the signer was not allowed to do so, and the Councilwoman allegedly called the police, who escorted the signer from the building.[1]
*164 Appellant’s original Civil Complaint abounds with anecdotal allegations of the poor treatment Appellant and others received from individual Council members. She alleges they were shunned, treated with condescension, ignored, spoken rudely to, and generally treated in an unprofessional, un-traditional manner by our elected leaders. Appellant goes into great detail about the ill-treatment she and other petitioners received at the hands of CBC members.
Appellees did not call for a referendum vote regarding the remainder of the settlement moneys; Appellees issued a public statement regarding the plans made for the remainder of the moneys, ie, the Qwam Qwmpt’ Plan.
Appellant filed the Civil Complaint in May, 2013 alleging violations of the Col-ville Tribal Civil Rights Act (CTCRA), CTC, Chapter 1-5. Appellee filed a Motion to Dismiss on June 13, 2013. After a hearing on the Motion to Dismiss on August 21, 2013, the Trial Court entered an opinion order dismissing the matter on October 7, 2013. Appellant filed a timely appeal from the Trial Court’s order. Briefs were ordered herein, and Oral Arguments took place on September 19, 2014.
Based on the reasoning below, and for the reasons therein stated, we affirm the dismissal.
DISCUSSION
There are four (4) issues we address in this opinion: (1) Does the Trial Court have subject matter jurisdiction over the Civil Complaint filed?; (2) Even if the Trial Court has subject matter jurisdiction, does the affirmative defense of sovereign immunity bar the action?; (3) Do the actions of the CBC violate due process guarantees of the CTCRA by refusing to either (a) hold the referendum vote or (b) allow petitioner to present the request to the CBC, thereby overcoming the defense of sovereign immunity?; and (4) Does custom and tradition overcome the defense of sovereign immunity to support a finding that petitioner should get a hearing at the trial level to present her requests for declaratory and injunctive relief?. All four issues are questions of law; our review is tie novo. See CCT v. Naff, 2 CCAR 50 (1995) and its progeny.

1) Does the Trial Court Have Subject Matter Jurisdiction Over the Civil Complaint filed ?

 Subject matter jurisdiction is the ability of the Court to hear the matter before it. It must be found in each case before the Court can take any action in the case. See, e.g., Seymour v, CCT, 6 CCAR 5 (2001), and Green v. Green, 10 CCAR 37, 9 Am. Tribal Law 258 (2011). Our Courts are first guided by the statutory laws of the Tribes in order to determine subject matter jurisdiction. CTC § 1-1-70 states we have original jurisdiction over all tribal lands and all the persons therein. CTC § 2-2-1 states our Courts have civil jurisdiction of all suits involving persons residing within our jurisdiction. CTC § 1-5-4 states that any cause of action filed under the Colville Tribal Civil Rights Act (CTCRA), CTC, Chapter 1-5, can only be brought into the CCT Courts.
The Trial Court held it did not have jurisdiction to hear the case because it found the Tribes were shielded by the doctrine of sovereign immunity. The Trial Court confused subject matter jurisdiction with an affirmative defense. It is dear *165 from our statutes that our Courts have subject matter jurisdiction to hear actions brought under the CTCRA. Appellee conceded this at the Oral Arguments. We so hold.

2) Even if the Trial Court has subject matter jurisdiction, does the affirmative defense of sovereign immunity bar the action?

The doctrine of sovereign immunity has long been incorporated in both our statutory and case laws. See, CTC § 1-1-6, Sovereign Immunity,[2] CCT v. Naff, 2 CCAR 50 (1995); and CTEC v. Orr, 5 CCAR 1 (1998). It is an affirmative defense. For example, the U.S. Supreme Court, in Wisconsin Department of Corrections v. Schacht, 524 U.S. 381, 118 S.Ct. 2047, 141 L.Ed.2d 364 (1998), a case discussing sovereign immunity claims in federal court by a State under the Eleventh Amendment, recognized sovereign immunity as an affirmative defense which the State could waive, if it so chose. Id. at n. 389, 118 S.Ct. 2047.
In CTEC v. Orr, supra, we stated: “Thus, in order to defeat the sovereign immunity claim herein, Orr’s only position is to show that under the Tribal Civil Rights Act, CTC Chapter 1-5, CTEC was subject to the waiver of immunity because of violations of Orr’s due process.” In this case, the Tribes have raised the defense of sovereign immunity in a timely fashion. As in the Orr case, Appellant must show a violation of her due process or equal protection rights under CTC, Chapter 5-1 in order to overcome the defense, which once raised by Appellees would, as a general rule, defeat this action.

3) Do the actions of the CBC violate due process guarantees of the CTCRA by refusing to either (a) hold the referendum vote or (b) allow petitioner to present the request to the CBC, thereby overcoming the defense of sovereign immunity?

As stated at the beginning, the litany of alleged actions which do not comport with leadership behavior by some of the Council members, have caused frustration and dissatisfaction to some tribal members, thus fueling part of the lawsuit herein. It is also apparent, however, that money is also a fuel upon which this cause of action is driven. We are asked to assess the actions of the appellees, as the elected officials of our government, in the light of our customs and traditions.
As a tribal forum, we have long recognized that even though our court system have become “westernized,” and modeled in large part on that of our sister jurisdictions, federal and state, we have a higher responsibility to maintain the “tribal” in our courts first and foremost. In Smith v. CCT, 4 CCAR 58, 2 CTCR 67, 25 ILR 2566 (1998), we stated:
We believe that incorporating our customs into our written law is very important. It is what will set us apart from the state and federal courts. Our courts must approach this carefully, however. Customs and traditions are viable, living doctrines that grow with the community and the time. They are not static, frozen in the past of tepees and buckskin clothing. A good analysis of the applicability of custom and tradition in a case must be able to trace a current practice *166 back to its roots in our society. It will not necessarily have the same complexion, but it should have the same foundation. Our customs and traditions define our uniqueness not only from the non-Indian society, but from other Indian tribes, too. To define a custom or tradition in our current Tribal Court system is an important task which should not be taken lightly by the courts or the parties. At p. 61.
The tradition we are asked to assess in this case is that of that of listening and letting all who wished to have input for the issues to be decided an opportunity to be heard fully before a decision was made. We recognized this tradition in CCT v. Meusy, 10 CCAR 62 (2011). In Meusy, a case in which we recognized the doctrine of separation of powers as having a cultural foundation, we also stated that our early leaders recognized “... separate leadership duties, an opportunity to participate in decision-making by all of the community, and a responsibility of the leaders to decide.” Id. at p. 69.
Appellant asserts that this tradition was not followed by our elected leaders, thereby violating her right to due process under the CTCRA. As we stated before, our customs and traditions are viable doctrines which, by necessity, grow and change to meet the ever-changing nature of our government.
In 1937, 77 years ago, the members of the twelve tribes voted to establish a new, confederated government. We passed a Constitution and Bylaws, and established a representative government for all 12 tribes; the number of representatives were from districts and not necessarily identified by individual tribes any more. We became known as “The Confederated Tribes of the Colville Reservation,” and it is a separate entity from the many individuals comprising the combined membership. We made a transition from selected leaders to elected leaders: an evolvement of a tradition.
Before the establishment of a westernized representative government in 1937, when the members no longer believed in the leadership of someone, they just stopped following him or her as a leader. Sonnenberg v. Colville Tribal Court, 5 CCAR 9 (1999). Now the process is that we just stop electing him or her. Again, this process has been in place for 77 years.
In support of her assertion of a tradition and custom which would require the CBC to either (a) order an referendum vote, or (b) allow Appellant and others to meet with the CBC on this issue, Appellant asserts that historically past CBC members allowed input from tribal members in such decision-making processes. As examples she references the actions past Councils took during the negotiations and settlements of what we now refer to as the 181-D claims moneys. The CBC actions took place as early as the late 1960’s, and culminated in a settlement in 1994. Throughout the settlement process past Councils invited input from tribal members on the pertinent issues. Appellant referred to other similar instances in her original Civil Complaint.
Past historical practices of Councils do not necessarily establish a tradition or custom, however. Although such a practice may have customary roots, it does not become a requirement for the elected representatives, who change on a yearly basis. The CBC are guided by the Constitution and the statutory laws when defining its legal responsibilities. We couldn’t find anything in the written Constitution or laws of the Tribes which requires that past practices of CBC members bind how current CBC members must conduct their business. There is nothing in either the Constitution, Code of Professional Conduct *167 (CTC, Chapter 1-8), or the Council’s Oath of Office which require Council members to listen to, or seek input from, tribal members before making decisions regarding monetary settlements with the federal government.
Appellant erroneously argues CTC § 1-5-1 requires CBC to give them a hearing before the Council. This statutory section states the CBC cannot pass a law which prevents tribal members from petitioning for redress of grievances. There are no statutory laws which forbid the petitioning for redress of grievances; there is only the conduct of the CBC members, as representatives of the tribal members, which prevent granting an audience with the Council. This conduct, no matter how frustrating to the Appellant and other tribal members, does not rise to a level of a due process violation of the right to petition for redress under the Tribal Civil Rights Act. Appellant has not met her burden on this issue to overcome the defense of sovereign immunity. We so hold.
j) Does custom and tradition overcome the defense of sovereign immunity to support a finding that petitioner should get a hearing at the trial level to present her requests for declaratory and injunctive relief ?
The crux of this argument is that Appellant alleges she was not provided due process as required by the CTCRA. She alleges the actions of the individual Council members are ultra vires, in that some of them individually denied her the right to meet with the CBC and present the request to have input in decisions on what to do with the settlement money. Further, she alleges that due process requires the Trial Court give her a hearing on her requests for declaratory and injunctive relief.
When asked at the Oral Arguments what fundamental due process right was being violated, Appellant’s answers were (1) the property right of Appellant and others similarly situated to the settlement moneys and how it was distributed; and (2) the procedural due process rights to be given notice of the settlement, and an opportunity to be given a chance to have a say in how the settlement money is spent. Appellant also argues she has a procedural due process right to an accounting from Appellees of how the money is being and has been spent. Appellant argues the CTCRA supports her claim for such declaratory relief, as well as for asking for an injunction against Appellees from spending the money before the resolution of this case.
Appellee eounter-argues that such interference by the courts would violate the doctrine of separation of powers. Appellee argues the matters are political and answerable only by the CBC as the Constitutionally-designated representative of all tribal members. We are not unfamiliar with the doctrine of separation of powers. In Meusy, supra, we found that this doctrine has cultural roots in our tribes. Meusy at p. 69. In Meusy we recognized that before our 1937 government, our several tribes were guided by the leadership of several leaders, some for very specific responsibilities, e.g. salmon leader, war leader, and others. As a tribe, all members, including the different leaders, discussed issues important to the tribal members, and had input in what the decision should be; ultimately, however, the leader made the final decision. This tradition has evolved.
In 1937 our tribal members voted to change the traditional decision-making method when it adopted a Constitution and Bylaws which, among other things, designated a representative governmental body: *168 the Colville Business Council. Unlike some tribes, we do not have a General Council of all tribal members with superintending powers over the CBC.
The Constitution makes no provision for a General Council nor any other ‘‘override” provision whereby the combined membership has authority to make laws or order the CBC to do or not do an act. The Constitution is now the supreme law of the land. The combined membership voted for a constitutional government and, by implication, removed ultimate authority of the combined membership.
The combined membership reserved for itself in the Constitution the right to remove CBC members by the process of recall and to amend the Constitution by referendum. It also reserved the right to regularly elect CBC members. All other powers of the combined membership, actual or perceived, were relinquished and granted to the CBC.
Appellant’s assertion that her due process claims rest on her property right to the settlement moneys is misplaced. She is just one tribal member; the CBC are responsible for and answerable to all the tribal members (over 9500 members) collectively, and not just those who come forward with the requests Appellant is making. She has an undivided interest in any of the assets of the Tribes, which, in this case, does not rise to an actionable right under the CTCRA when the CBC makes a decision on how to use an asset. She cannot speak for over 9500 tribal members without their input and agreement.
Appellant argues that she should be able to flesh her arguments out at the trial level because she has asked for declaratory and injunctive relief as allowed by the CTCRA. She opposes having this Court of Appeals make the final decision without the action first being heard by the Trial Court. We disagree.
No matter what arguments she wraps her CTCRA complaint in, the bottom line is: she is not satisfied with how the Appel-lees have decided to distribute the $93 million settlement. She does not think she should have had any of it taken from her to satisfy a debt owed to the Tribes. She does not want the CBC to be the final decision-maker on how the money is spent. The bottom line in this aetion, when one brushes aside generalized statements of custom and tradition, is money.
This case is also about how Appellant, and others, feel CBC members are non-responsive to the membership. It is about poor communication skills. It is about the power to exclude tribal members from meeting with their representatives, whatever the reason. It is a cauldron of frustrations. In recognizing what precipitated this legal action, we acknowledge that some things could have been approached more civilly and professionally, if the allegations in the Civil Complaint are even partly true. These are not matters for the Courts to resolve, however. The solutions lie in exercising one’s voting rights wisely. If the membership want elected officials who allow open meetings, open dialogues, traditional treatment, respect, and courtesy, the membership must elect those who have these qualities. Our Courts cannot dictate Appellees to have these attributes; the membership must dictate them by how they vote.
Appellant has failed to overcome the defense of sovereign immunity with her due process assertions. We so hold.
CONCLUSION
Based on the foregoing, we find first that this Court, and the Trial Court, have subject matter jurisdiction to hear this case, as well as personal jurisdiction over *169 the parties. Secondly, Appellee has asserted the affirmative defense of sovereign immunity in a timely fashion. Finally, there are no Colville Tribal Civil Rights Act violations asserted by Appellant which would overcome the defense of sovereign immunity. As a matter of law, there would be no different answer at the Trial Court level regarding the assertions of due process Appellant has made and Appellees’ defense of sovereign immunity, so there is no good reason to send the matter back to the Trial Court for a hearing on the request for declarative and injunctive relief.
It is so ORDERED.

. We cannot find as a fact that the record shows the existence or non-existence of the *164 petition purportedly signed by over 2700 tribal members because neither it, nor a copy of it, was filed with the Trial Court.

. 1-1-6. Sovereign Immunity. Except as required by a federal law, or the Constitution of the Colville Tribes, or as specifically waived by a resolution or ordinance of the Council specifically referring to such, the Colville Confederated Tribes shall be immune from suit in any civil action, and their officers and employees immune from suit for any liability arising from the performance of their official duties.